IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

MICHAEL J. THOMPSON,
    Plaintiff,

v.

NANCY BERRYHILL, Acting
Commissioner of Social Security,
    Defendant.

Case No. 1:15-cv-01513-JES

## ORDER AND OPINION

Now before the Court is the Plaintiff, Michael J. Thompson's, Motion for Summary Judgment (Doc. 13) and the Commissioner's Motion for Summary Affirmance (Doc. 19).[1] The Motions are fully briefed, and for the reasons set forth below, the Court denies the Plaintiff's Motion for Summary Judgment and grants the Commissioner's Motion for Summary Affirmance.[2]

## I

On February 2006, the Plaintiff applied for supplemental security income (SSI) and disability insurance benefits under the Social Security Act, alleging a disability onset date of October 21, 2005 due to spinal disorders. His initial application was denied, and he filed a request for reconsideration. His reconsideration, which included neuropathy in his right hand, depression, and anxiety, was denied because he was found to be capable of performing his previous work as an apartment manager. After a hearing before the ALJ, held on January 16, 2008, the ALJ found that the Plaintiff was not disabled. The Plaintiff appealed the decision to the Appeals Council,

---

[1] Nancy Berryhill replaced Carolyn Colvin as Acting Commissioner of Social Security on January 23, 2017. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Nancy A. Berryhill is substituted for Acting Commissioner Carolyn W. Colvin as the defendant in this suit.
[2] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 7) on the docket.

where the decision was affirmed. The Plaintiff subsequently filed a civil action with this Court. The Court granted in part and denied in part the Plaintiff's Motion for Summary Judgment. On September 19, 2012, the Court remanded the case pursuant to sentence four of 42 U.S.C. § 405(g) and instructed the following: 1) a determination of whether Plaintiff's impairments equal Listing 11.14 for peripheral neuropathies, 2) analysis of Plaintiff's assertions of severe and chronic pain, and 3) consideration of how Plaintiff's hand pain and numbness factor into his eligibility for disability benefits. (AR 841).

The ALJ entered a second unfavorable decision on December 8, 2014. (AR 596). The Appeals Council denied Review on October 19, 2015, making the ALJ's decision the final decision of the Commissioner. Thompson filed the instant civil action seeking review of the ALJ's Decision on December 17, 2015. (Doc. 1).

## II

### 1. Medical History

At the time he applied for Social Security benefits in 2006, Michael Thompson was a 33-year-old biracial male with a college degree and who lived by himself in Peoria, Illinois. He became disabled in 2005. He has never married, and has no children. (AR 191). He suffered from back problems for many years. (AR 88). He had been treated with exercise, therapy, a TENS unit, medication, steroid injections, and treated by multiple physicians. (AR 88-89; 215-17). In the past, Thompson was a manager and accountant for the City of Peoria, but had to stop working due to his alleged disability. He reported that he experienced intensive swelling and it was difficult for him to "get around." (AR 212). He also claims his medications are a factor in his inability to continue working. (AR 570). On his Form 3368, he was reportedly 6 feet tall and weighed 165 lb. (AR 211) but he gained a significant amount of weight in 2007 (AR 548).

For activities of daily living, he stated that he has issues getting in and out of a car due to pain. A few times a week, he experiences severe side effects from medication rand must be extremely cautious while attempting to operate a car. (AR 244). The following details are taken from Thompson's self-reports. Several times a day, he has pain and weakness in his lower back, left foot, and lower leg when he stands, gets out of bed, or bathes; he has injured himself falling in the bathroom. (*Id.*; AR 259). He needs to use the handrails when he climbs stairs, and due to his difficulties he now only attempts to climb stairs at home. He sometimes uses crutches. It exacerbates his back problems if he sits for too long. He experiences issues shopping or preparing a meal, because he can only stand 5-10 minutes at a time. *Id.* He shops once a month. (AR 258). In 2006, he reported taking between 9-11 prescription drugs and this amount continues throughout the record. (AR 246, 254, 263-64, 286, 301, 512). He reported that he completed many household chores, but added that he has help with all of the activities. (AR 258). He is forgetful and has difficulty concentrating. (AR 259). He does not sleep well. (AR 260). Thompson only leaves the house once or twice a week to pick up prescriptions. The neuropathy affects his ability to use his arms and hands, affecting his ability to use kitchen tools, carrying grocery bags, and otherwise completing everyday tasks slowly. (AR 265). He drops things and has problems with his balance. (AR 272). In 2007, he lost his home due to his lack of income. (AR 279-281). He also has severe depression. (AR 524, 542).

The Claimant has an extensive medical history. His back and sciatic nerve pain (AR 212, 403, 408) began in 1999, and in 2005—his alleged onset date—he was seen by doctors due to pain, swelling, and redness in his legs. (AR 309, 307). Thompson began seeing a rheumatologist in late 2005 as well as three other doctors for the leg pain and swelling. (AR 311, 406-08). He was treated by rheumatologist Dr. Doshi at this time. He stopped working in October 2005. Dr.

Rakoff noted that Thompson was doing "reasonably well" (AR 328) but a few months later, Dr. Nathan read an MRI scan that revealed a narrowing of the left lateral recess due to disc protrusion. (AR 365-66). Dr. Hemp, less than a month later, treated Thompson at the emergency room for sever lower back pain. (AR 336). Dr. Hemp noted Thompson's lumbar disc disease and arthritis in his report. *Id.*

Soon after, Thompson began to see Dr. Li, a rehabilitation medicine specialist. (AR 409). Dr. Li prescribed bed rest and treated Thompson with epidural steroid injections and a muscle relaxant. (AR 371, 410-12). Dr. Tracy, a neurosurgeon, also examined Thompson, but opined that the Claimant's MRI did not show disc herniation or evidence of neural compression. (AR 360-62). Dr. Tracy recommended physical therapy, a shoe lift, and other at-home treatment, although he did not think Thompson was a candidate for surgery. (AR 361). Thompson continued to receive treatment for his back problems. (AR 396, 444-58).

He began seeing a psychiatrist, Dr. Attaluri, for depression and anxiety. (AR 469-71). Dr. Attaluri, who thought the mental health issues were related to chronic pain, prescribed medication. *Id.* Thompson was also seen by Dr. Habecker, a state examiner, in 2006. Dr. Habecker noted extreme lower leg sensitivity, piriformis syndrome, degenerative disc disease, and peripheral neuropathy. (AR 380-81). Dr. Habecker stated that Thompson seemed "drugged" (AR 379) but that Plaintiff expressed that he had constant pain and cannot sit for more than 2 or 3 hours or stand for more than 5 minutes. (AR 378).

In mid-2006, Dr. Smalley evaluated the Claimant's Residual Functional Capacity (RFC), finding some limitations but no significant problem with his legs. (AR 473-74, 480). Dr. Liu, a neurologist, saw Thompson in August and observed that Thompson had numbness and pain in his right arm, and that his "clinical presentation is not typical for people who have severe chronic

4

pain" (AR 486), recommending that Thompson get a second opinion from Mayo Clinic or another medical center. (AR 486). Dr. Gowda gave Thompson a 10 lb. lifting restriction (AR 563) but two days later Dr. Burke examined him and determined that his mental capacity could not be accommodated, because it was "compromised with his multiple use of pain medications" preventing him from performing tasks at his employment. (AR 577).

In December 2006 and early 2007, Dr. Couri, a rheumatologist, noted that the Claimant wished to return to work, and offered to write a letter for him. (AR 551, 553). Dr. Couri also opined that he didn't think Thompson had to be off the pain medication before working. Dr. Couri wrote a letter to the SSA in September 2007; however, the letter stated that he would miss more than one day a week and "it would be difficult for him to work any full-time job and be a reliable employee." (AR 547). After a hearing before the ALJ, the ALJ issued an unfavorable decision on April 14, 2008.

The Claimant continued to seek treatment. On his March 2012 application, Thompson stated that he lived in Oneida, Illinois. (AR 1040). He claimed he experienced the following medical conditions: osteoarthritis, lumbar disc disease, neuropathy in fingers of both hands, anxiety, sciatica neuropathy, hip bursitis, lumbar radiculopathy, cervical disc protrusion, lumbar disc herniation, chronic lumbar disc pain, chronic neuropathy in left leg, and depression. (AR 1108). In 2009, Dr. Jones evaluated him for his lumbar disc disease and other spine disorders. Dr. Jones reviewed MRI and X-ray scans and concluded that physical therapy and home exercises were appropriate treatment. (AR 1116). Dr. Jones added that epidural steroid injections were needed if the pain increased. (AR 1344). Similarly, Dr. Pavlovich evaluated these issues and came to a similar conclusion, adding that he should continue his medication. (AR 1117). After an assessment, Dr. Rogers, a clinical psychologist, provided a treatment intervention for

psychological pain treatment. (AR 1118). Dr. Russo regularly evaluated the Claimant for his disc problems and related pain that resulted from these issues, and referred him to a rehab facility for physical therapy. (AR 1119). In March 2012, after being in a car accident, Dr. Russo noted that Thompson does not believe that physical therapy is working and "does not appear to be in any acute distress but appears to be mildly to moderately uncomfortable." (AR 1459). Dr. Russo also reported that his "[u]pper extremity strength and lower extremity strength appear to be normal." (AR 1460). Dr. Guo noted Thompson's numbness, tingling, and sharp shooting pain in both legs, hands, and fingers. (AR 1120). In August 2009, the Claimant was treated by an emergency room physician who gave him and X-ray and therapeutic services. (AR 1121).

On his 2012 function report, Thompson said he could dress himself and take medication, but he continues to frequently spill things and takes rest periods. (AR 1129-30). Due to his neuropathy he cannot enjoy many hobbies and speaks on the speaker phone when he talks with family and friends. (AR 1133, 1591). Carrying grocery bags, etc. causes his back and hands a great deal of pain, so he needs assistance. (AR 1138). He continues to experience problems with balance and daily tasks, such as brushing his teeth, causes pain in his back. (AR 1209). Sitting for an hour causes him terrible pain. (AR 1214). His medications still affect his sight and memory. (AR 1215). In June 2009, Dr. Zagardo found that at the L4-L5 level, Thompson's degenerative disc change was described as mild/moderate loss of disc space height, and moderate diffuse disc bulge that did not displace the nerve roots. (AR 1490). However, at the L5-S1 level, "there is severe degenerative disc change with loss of disc space height and disc [desiccation]." *Id.*

After his car accident, Thompson informed his doctor that the wreck made his neck and upper back pain worse; however, the pain improved over time. (AR 1605, 1608, 1590, 1593,

1713, 1881). In 2012, Dr. Russo described his pain as moderately uncomfortable. (AR 1588). In May 2012, Dr. Couri noted that he had more definite tenderness at the fibromyalgia tender points and decreased neck and back movement, although his neuropathic symptoms were mild. (AR 1605). He has been told one leg is shorter than the other and Dr. Tony noted that he has a slight limp. (AR 1656). In July 2012, Dr. Couri noted that his objective symptoms included being moderately tender at the gluteus and trochanters. (AR 1719). In 2012, Dr. Dawalibi listed 24 different prescription medications, over-the-counter medications, and supplements that the Claimant was supposed to take. (AR 1785-87; 1835-36). In 2013, according to Dr. Williams, he had some new disc protrusion at L4-L5 compared to 2009, but "no significant compromise of the spinal canal or neural foramina" although facet hypertrophy was present. (AR 1878). At L5-S1, there was "pronounced disc space narrowing, and a moderate to large central disc protrusion." *Id.* There was mild foraminal narrowing bilaterally at L5-S1. *Id.*

The Claimant reported in October 2012 that he did not have issues sleeping. (AR 1979). In July 2013, Dr. Mikala Brinkman found "mild to moderate neural foraminal narrowing. No significant central spinal stenosis." (AR 1922). Dr. Couri, in September 2013, noted that his tender points included his neck, back, gluteus, and trochanters; additionally, Dr. Couri noticed that the Claimant seemed depressed. (AR 1965). In August 2013, Dr. Tony opined that the Claimant appeared normal; he had normal reflexes in his upper and lower extremities, and his neurological sensations were found to be normal. (AR 1977). That year, he was also receiving steroid injections for pain. (AR 1980-81). Dr. Tony similarly gave a normal evaluation in February 2014. (AR 2018). However, he noted an abnormal vibration sensation and bleeding per rectum. *Id.* According to Dr. Couri, the EMG tests revealed definite damage to the sciatic nerve with demyelination and axonal loss and neuropathy in his hands. (AR 2044).

## 2. Hearings Before the ALJ

At the hearing before the ALJ on July 24, 2013, the Claimant and vocational expert (VE), Dennis Gustafson, testified. The Claimant stated that he was 6 feet tall and weighed 230 lb. He testified that he only drives occasionally, and he drives short distances. (AR 637). He testified that he was completing his sister's taxes for her, but he does not complete taxes for other individuals for money. (AR 638-39). His sister is his caretaker who comes to his home 3-5 days a week, but he does not pay her. (AR 240). He takes care of his personal hygiene. (AR 641). He testified that he stopped grocery shopping in 2007-08, nor does he cook. (AR 642). He continues to do very light cleaning, but he has not cleaned since 2007-08. (AR 644). He volunteered for his church in fall 2008 and spring 2010. *Id.* At church, he would volunteer for an hour or so, and help with the mailing. (AR 645). He moved from Peoria to Oneida in August 2011.

The ALJ asked Thompson about his felony theft and driving on a suspended license charges. (AR 647). Thompson testified that he pleaded to the misdemeanor theft charge, but he was not charged with driving on a suspended license. (AR 648).

When asked why Dr. Curry did not mention his issues with his hands, the Claimant testified that Dr. Curry treated him with cortisone injections for hip bursitis, and does not spend a lot of time with the Claimant when he sees him, so there would be nothing in the reports about the hand problems. (AR 658-59). He has a lot of pain when he gets dressed, and has a bath chair with rails. (AR 662).

The VE was given the following hypothetical:

ALJ: Assume the past work activity, same as the claimant's exertional capacity, and limit it at sedentary work, with a need also to have the option to alternate sitting and standing periodically during the day, not necessarily at will, but as circumstances would allow, so that if one desired, one could sit and stand equally throughout the day. No climbing of ladders, ropes, or scaffolds. Other postural functions performed occasionally. Need to avoid environmental hazards. Need to avoid concentrated exposure, let's say to

all environmental factors except noise, occasional overhead reaching. **Other manipulative functions can be performed frequently.** Limitation to the performance of simple and repetitive tasks that would involve little or no change in work routine, and occasional interaction with the public, coworkers, and supervisors. So, no past work could be performed, correct?

VE: That's correct.

\* \* \*

ALJ: Okay. So, anyway, with all that, and considering the vocational factors, the claimant being a young individual, would there be an[y] jobs in that national and/or regional economy that such a person could perform? Would you clarify with that hypothetical, despite his college degree and professional background, there'd be no transferability of skills, correct?

VE: That's correct.

ALJ: So, would there be any unskilled work that could be performed within the hypothetical?

(AR 673-75) (emphasis added). The VE responded that simple, repetitive, unskilled, sedentary jobs are going to be manual or manufacturing jobs, and non-machine related. (AR 675). The VE also responded that examples of jobs that the Claimant could perform include a shadowgraph scale operator, production worker, stone setter, hand packager, and ampule sealer. When questioned by the Claimant's attorney, the VE stated that an individual performing such jobs would have to be "on task at least 80 percent of actual time, or 90 percent of the production standard." (AR 676). Also, the VE stated that these jobs would require frequent use of hands. (AR 681). The jobs did allow for sitting.

On December 4, 2013, the ALJ held a supplemental hearing, in which Stacey Anderson, the Claimant's sister, testified. The Claimant testified first, and stated that he sees Dr. Gupta for pain. (AR 695). He gets epidurals and steroid shots twice a year. (AR 696). He still experiences difficulty with bipolar disorder and has adjusted his medication for that. (AR 698-701). Dr. Hudson diagnosed him with schizophrenia. (AR 701). He experiences symptoms such as light-headedness, dizziness, nausea, and vision problems. (AR 702). Because of his neuropathy,

sciatica, and hip bursitis, he uses a cane. (AR 703). He testified that his big toe on his left foot is totally numb, and this affects his balance. He prefers sitting in a recliner because it takes some of the pressure off his back. (AR 706).

Stacey Anderson testified next, and stated that she had been helping the Claimant since 2006. (AR 712-715). According to his sister, he drops things, is in constant pain, and she tries to drive him to the doctor and the store when she can. (AR 720, 725). She testified that he has drastic mood changes. (AR 722). While he used to lifeguard and be around other people, his sister testified that now he has little patience when he is around her kids. (AR 723). She testified that he gets cramps in his hand and she sees him massage his hand if he is writing. (AR 724).

At a second supplemental hearing on July 23, 2014, Dr. Winkler, a medical expert, testified by telephone. (AR 728). Dr. Winkler testified that she completed a fellowship in immunology and rheumatology, and has a Ph.D. in microbiology; she deals with all musculoskeletal diseases and ran a fibromyalgia clinic for 10 years. Dr. Winkler testified that she thought it was unclear whether Dr. Couri gave a diagnosis for fibromyalgia. (AR 733). Dr. Winkler said that Dr. Couri did not do the typical exam for fibromyalgia, and mostly concluded that the Claimant had tender points. (AR 734). Dr. Winkler believes that Dr. Couri should have documented the physical exams he performed or identify where the tender points were located, which would have been more consistent with a diagnosis of fibromyalgia.

Dr. Winkler did not think that piriformis syndrome was a severe impairment because it was not something that continued. (AR 735-36). Also, his complaints of pain are not well defined in the record. (AR 736). Dr. Winkler considered the hip bursitis as a condition related to disc disease. (AR 736-37). However, the doctor also noted that it is one of the tender points seen with fibromyalgia. Additionally, Dr. Winkler noted that there is no EMG evidence of peripheral

neuropathy, although there is evidence of radiculopathy. Dr. Winkler referenced multiple occasions where the Claimant's peripheral neuropathy was not present in his neuro exams. (AR 738). Dr. Winkler did not find any issues in the lower extremities except for abnormal vibratory sense at one point, sciatica or radiculopathy, and a mild change in the median ulnar nerve in 2012. (AR 738-39). Because the evidence did not include motor involvement but only mild sensory involvement, Dr. Winkler did not believe that the symptoms met the Listing for lumbar disease. (AR 739). Dr. Winkler also testified that the Claimant did not meet Listing 11.14 (Peripheral neuropathy).[3] The doctor testified that she limited the Claimant's motor function because he had complaints of pain and numbness, although there were little objective findings in the record. (AR 741). The doctor testified that Thompson's mild sensory neuropathy did not have a significant or very severe change in terms of the median nerve, and while it was bilateral, the objective evidence indicated that it was pretty mild. (AR 741-42). Dr. Winkler testified that the Claimant did not show disorganization of motor function, dexterous motions, or issues with gross motion. (AR 742). Dr. Winkler also opined that the Claimant's pain perceptions could be psychological. (AR 743).

When questioned by Thompson's attorney, the doctor opined that Thompson had a structural spinal disease, which was degenerative disc disease with encroachment on the nerve roots. (AR 748). She also testified that surgery is effective for leg problems related to radiculopathy but not effective for relieving back pain. She also stated that his structural spinal disease could have gotten worse, but there was not much MRI evidence to confirm this. (AR 749). His radiculopathy, she testified, improved with repeat EMG. Dr. Winkler also testified that there was no clinical findings on physical exams supportive of lumbar radiculopathy. (AR 756,

---

[3] Listing 11.14 (Peripheral neuropathy) incorporates Listing 11.04(b) by reference. See https://www.ssa.gov/disability/professionals/bluebook/11.00-Neurological-Adult.htm#11_04.

57). Dr. Winkler confirmed that his medications might affect his work because they affect his cognitive functions. (AR 751-52). His disc problems do not produce flattening or distortion or displacement of the nerve root or sheath complex. (AR 758). Dr. Winkler also opined that his problems would affect constant use of his hands but not frequent. (AR 761). She classified him as sedentary because of his sciatica or radiculopathy. (AR 763). At this hearing, the ALJ gave the same VE a modified hypothetical with additional limitations. When asked if "one could only engage in occasional operation of foot controls," the VE answered that this limitation would have an impact on the jobs that involve foot controls. (AR 774-75).

### III

In her written Decision following the hearing, the ALJ applied the standard five-step sequential evaluation process and ultimately found that Thompson was not disabled. The ALJ determined that Thompson satisfied step one because he had not engaged in substantial gainful activity since October 21, 2005, the alleged onset date. (AR 602).

At step two, the ALJ found that Thompson had the following severe impairments: depression, anxiety, peripheral neuropathy, fibromyalgia, spine disorder, and a history of piriformis syndrome. (AR 602).

At step three, the ALJ found that the medical evidence did not establish that Thompson's impairments met or medically equals the severity of a listed impairment, either individually or in combination. *Id*. Specifically, the ALJ found that he did not meet Listing criteria in 20 C.F.R. Pt. 404, Subpt. P., App'x 1; that is, he did not meet Listing 12.04 or 12.06. (AR 606). The ALJ considered the medical opinions in the record in making her determination. The ALJ cited Thompson's activities of daily living, his ability to live alone, and his accounting degree. The ALJ gave little credibility to Thompson's testimony, because she found that there were many contradictions and he had a theft charge to which he pled guilty in July 2008. Overall, the ALJ

found that Thompson had mild restrictions in activities of daily living, moderate difficulties in

social functioning, and moderate difficulties with regard to concentration, persistence or pace.

(AR 606). The ALJ included the following limitation: "During period of symptom exacerbation,

he may have some difficulty maintaining concentration, persistence, and pace, especially when

attempting detail or complex type tasks." (AR 607).

> In her RFC determination, the ALJ determined the following:

> [T]he claimant has the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567(a) and 416.967(a) except he is unable to climb ladders, ropes, or scaffolds; he is limited to occasional balancing, stooping, crouching, crawling, kneeling, and climbing ramps or stairs; he needs the option to alternate between sitting and standing periodically equally during the day, if desired; he is to avoid hazards; he is to avoid concentrated exposure to extreme temperatures, wetness, humidity, pulmonary irritants and vibrations; he is limited to occasional overhead reaching; he is limited to frequent handling, fingering, feeling, and reaching in other directions; he is limited to performance of simple and repetitive tasks that involve little or no change in work routine; and, he is limited to occasional interaction with the public, coworkers and supervisors.

(AR 607). In formulating that RFC, the ALJ discussed Thompson's symptoms consistent with

the objective medical evidence and other evidence. The ALJ stated that Thompson's statements

concerning the intensity, persistence and limiting effects of these symptoms were not entirely

credible. *Id*. The ALJ did state that the nerve conduction studies showed peripheral neuropathy,

but without moderate or severe abnormalities. Additionally, the ALJ found that the medical

evidence of his mental problems did not demonstrate that he is unable to work.

At step four, the ALJ determined that Thompson is unable to perform any past relevant

work. At step five, the ALJ determined that Thompson could perform a significant number of

jobs that exist in the national economy. (AR 610-11).

## IV

As discussed briefly above, the Court previously remanded this case to the SSA, directing

the ALJ to include the following: 1) a determination of whether Plaintiff's impairments equal

Listing 11.14 for peripheral neuropathies, 2) analysis of Plaintiff's assertions of severe and chronic pain, and 3) consideration of how Plaintiff's hand pain and numbness factors into his eligibility for disability benefits. (AR 841).

Thompson argues that the ALJ erred in a number of ways. First, the Court notes that the brief provided by the Plaintiff is similar to briefing filed previously in this case, where the Court had stated that the arguments "overlap or are not stated clearly." (AR 825). The Plaintiff sets out a number of facts and cites to evidence often without explanation or argument. As such, the Court has construed the Plaintiff's claims in a way to address arguments supported with appropriate authority without creating arguments for the Plaintiff. Counsel for the Plaintiff is reminded that undeveloped and unsupported arguments are waived, and the Court may not craft arguments and perform the necessary legal research. See *Anderson v. Hardman*, 241 F.3d 54, 545 (7th Cir. 2001) (stating that the court "cannot fill the void by crafting arguments and performing the necessary legal research."); and *United States v. Bekowitz*, 927 F.2d 176, 1384 (7th Cir. 1991) ("perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived").

The Plaintiff alleges that the ALJ erred at steps 3, 4, and 5. The issues raised in the Thompson's brief are the following: 1) the ALJ erred at step 3 in finding many contradictions in the Claimant's testimony and statements; 2) the ALJ erred at the step 4 determination in not explaining why nonexertional limitations would not affect all sedentary work; 3) the ALJ erred in the RFC determination; 4) the ALJ did not follow the treating physician rule; 5) the ALJ did not properly follow instructions on remand to evaluate the limitations cause by the Claimant's medications; and 6) the hypothetical posed to the VE was flawed.

## A

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. See 20 C.F.R. § 404.1566 (1986). The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614

F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. See 20

C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1)      currently performs or, during the relevant time period, did perform any substantial gainful activity;
2)      suffers from an impairment that is severe or whether a combination of her impairments is severe;
3)      suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;
4)      is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and
5)      is unable to perform any other work existing in significant numbers in the national economy.

*Id*. An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5,

to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3,

stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v.*

*Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4.

However, once the plaintiff shows an inability to perform past work, the burden shifts to the

Commissioner to show ability to engage in some other type of substantial gainful employment.

*Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir.

1984).

**B**

The issues raised in the Plaintiff's are the following: 1) the ALJ erred at step 3 in finding

many contradictions in the Claimant's testimony and statements; 2) the ALJ erred at the step 4

determination in not explaining why nonexertional limitations would not affect all sedentary

work; 3) the ALJ erred in the RFC determination; 4) the ALJ did not follow the treating

physician rule; 5) the ALJ did not properly follow instructions on remand to evaluate the

limitations cause by the Claimant's medications; and 6) the hypothetical posed to the VE was flawed.

### 1. Credibility

Thompson argues that the ALJ erred in evaluating Thompson's credibility. The ALJ noted several contradictions in the record, especially Thompson's activities of daily living and ability to live by himself, despite his complaints. The Commissioner responds that the ALJ articulated the inconsistences that prompted him to distrust Thompson's subjective reports of his limitations, particularly his complaints of pain. For example, the Commissioner cites Dr. Liu's report, and notes that he was not in distress during the hearing and was able to participate and concentrate in the hearing. The Commissioner also argues that the ALJ thoroughly discussed Thompson's ongoing treatment and acknowledged his limitations in his final determination.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v. Astrue,* 688 F.3d 306, 310–11 (7th Cir. 2012). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported ... can the finding be reversed." *Sims v. Barnhart,* 442 F.3d 536, 538 (7th Cir. 2006) (citation omitted). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v. Barnhart,* 357 F.3d 697, 703 (7th Cir. 2004); *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004). "Without an adequate explanation, neither the applicant nor subsequent reviewers will

have a fair sense of how the applicant's testimony is weighed." *Steele v. Barnhart,* 290 F.3d 936, 942 (7th Cir. 2002).

The ALJ met his burden to minimally articulate reasons for discounting the Claimant's testimony. As the Commissioner indicates, the ALJ considered the objective medical evidence and compared the records with Thompson's testimony. The ALJ gave a number of other reasons why he found the Claimant's testimony not credible. For example, he found that Thompson's ability to do tax returns for others in 2013 and volunteering at church in 2010 belie his testimony that he is unable to perform most daily activities or participate in social functions. The ALJ determined that Thompson can perform household tasks and attend to his own needs, shop, use a computer, drive, interact with friends and family, handle his finances, relax in a reclining-massage chair, and sit in his Jacuzzi. (AR 608). The ALJ needs to build a logical bridge from the evidence to his conclusion, and did so here. See *Murphy v. Colvin*, 759 F.3d 811, 815 (7th Cir. 2014), quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). The ALJ cited evidence in the record that a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

Thompson testified that he was completing his sister's taxes for her, but he does not complete taxes for other individuals for money. (AR 638-39). Thompson testified that he would volunteer at church for an hour or so, and help mailing. (AR 645). The Court must give deferential treatment to the ALJ long as the ALJ "minimally articulated his reasons." *Elder v. Astrue,* 529 F.3d 408, 415 (7th Cir. 2008). The 7th Circuit considers this deferential treatment "lax," and allows the Court to uphold the ALJ's opinion even if reasonable minds could differ. *Id.* at 713. Although the evidence that Thompson cites to indicates that there could be an

alternative conclusion, the Court determines that the ALJ's credibility determination is supported with facts from the record and behavior the ALJ observed.

Finally, as the ALJ indicates, Thompson has a theft conviction in 2008. For this reason, that theft is a crime of dishonesty, the ALJ determined that Thompson was not entire credible and his testimony contradicted itself. (AR 603, 608). The Court may only overturn a credibility determination if it is patently wrong, or without an adequate explanation. *Shideler,* 688 F.3d at 310–11 (7th Cir. 2012); *Steele,* 290 F.3d at 942. Here, the ALJ's credibility determination is adequately supported. The ALJ did not err in his credibility determination of the Claimant's testimony, especially those including subjective complaints and the extent of his impairments.

### 2. Nonexertional Limitations

Thompson argues that the ALJ erred at the step 4 determination in not explaining why nonexertional limitations would not affect all sedentary work. He argues that the limitations the ALJ gave regarding mental impairments would affect his sedentary work because there is a production standard in every job.

Exertional limitations are symptoms that affect a claimant's "ability to meet the strength demands of jobs." 20 CFR § 404.1569(b). Nonexertional limitations are those which affect a claimant's "ability to meet the demands of jobs other than the strength demands." § 404.1569(c). Examples of nonexertional limitations include anxiety or depression, difficulty maintaining attention or concentration, understanding or remembering detailed instructions, difficulty seeing or hearing, or difficulty with manipulative or postural functions (e.g. handling, crawling). *Id.*

The ALJ clearly addressed these limitations in his RFC determination and throughout his Decision. For example, "he is to avoid concentrated exposure to extreme temperatures, wetness, humidity, pulmonary irritants and vibrations" and "limited to occasional overhead reaching" and

"frequent handling, fingering, feeling, and reaching." (AR 607). The ALJ also limited him to repetitive tasks and limited his social interaction. *Id.* Finally, the ALJ also explicitly stated that: "All of the claimant's impairments, including nonsevere impairments, have been considered in assessing the claimant as capable of performing this range of sedentary duty work." (AR 610). Also, the ALJ stated that "the record does not include objective psychological or psychiatric test results that demonstrate that he is disabled and unable to work due to mental distress." (AR 607). Thus, the ALJ adequately addressed the Claimant's nonexertional limitations. The ALJ further limited the sedentary jobs that Thompson could perform due to any limitations he found supported in the record. (AR 611).

### 3. RFC Determination

Thompson also argues that the ALJ erred because he did not discuss significant symptoms in his RFC. Specifically, he argues that the ALJ missed his difficulty with concentration due to his extreme pain, missing work due to doctor appointments, needing to lay down during the day, and exertional limitations. Finally, Thompson argues that the ALJ erred in concluding that he could frequently use his hands for work.

The Commissioner responds that the ALJ considered the medical side effects and properly discounted them due to the inconsistencies in his reports. The Commissioner argues that the ALJ even included limitations in the RFC for these side effects. Also, the Commissioner contends that the ALJ's reasoning that he could perform simple, repetitive task that involve little or no change in work routine is unchallenged by the Plaintiff. Therefore, according to the Commissioner, substantial evidence supports the ALJ's assessment.

An ALJ is not required to discuss every piece of evidence, but "must address significant evidence and explain why strong evidence favorable to the claimant is overcome by the other

evidence." *Buckhanon ex. rel. J.H. v. Astrue*, 368 F. App'x 674 (7th Cir. 2010) (citations omitted). *Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). In the Decision, the ALJ stated that although Thompson's impairments "can be anticipated to produce a certain amount of pain and other potentially disabling symptoms," there was a lack of evidence associated with "intense and disabling pain." (AR 607). Also, the ALJ determined that Thompson has only required "conservative type care" and "does not have disabling side effects due to medication." (AR 608). Due to side effects of the medication, the ALJ prohibited Thompson to from climbing and limited him to occasional balancing, stooping, crouching, crawling, and kneeling. (AR 610). The ALJ also found moderate difficulties for concentration, persistence or pace, and cited specific evidence in the record for his determination and the Claimant had only moderate difficulties. (AR 606). The ALJ mentioned Thompson's ability to follow the news, use a computer, control his own finances, and complete tax returns for others. (AR 606-07, 610). The ALJ also found it significant that Thompson still lives independently. The ALJ addressed significant evidence and gave reasons for the limitations in the RFC.

Thompson argues that he will be forced to miss work due to his symptoms. As the Commissioner points out, these estimations are subjective. Moreover, he has not shown why the ALJ did not meet his burden to show ability to engage in substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984). As stated above, the ALJ adequately explained why he found certain statements to be not credible. The ALJ included an exertional limitation that Thompson must have "the option to alternate between sitting and standing periodically equally during the day." (AR 607).

The Court finds that the ALJ built a logical bridge from the evidence of record to the RFC determination. *Murphy v. Colvin*, 759 F3d 811, 815 (7th Cir 2014), quoting *Schmidt v*

*Barnhart*, 395 F3d 737, 744 (7th Cir 2005) (explaining that the ALJ must "build a logical bridge from the evidence to his conclusion, but he need not provide a complete written evaluation of every piece of testimony and evidence"). In other words, this Court can "trace the path" of the ALJ's reasoning for the limitations he found within the record. See *Diaz v Chater*, 55 F3d 300, 307 (7th Cir 1995) (stating that an ALJ must articulate at a minimum level his analysis of the evidence to allow the appellate court to trace the path of the ALJ's reasoning).

### 4. Treating Physician

The Plaintiff next argues that the ALJ improperly adopted the opinion of Dr. Winkler and discredited the treating physician, Dr. Couri. Dr. Anne Winkler is the medical expert who testified as an expert medical witness at the hearing. (AR 1010-11). After nearly two pages of listing evidence about the Plaintiff's hands in the record, the Plaintiff's brief finally makes the argument that the ALJ improperly accepted the opinion of Dr. Winkler, who opined that Thompson did not meet Listing 11.14 and he could frequently use his hands. (Doc. 14, p. 13). The Plaintiff makes the argument that this doctor was retained to disagree with the records and Dr. Tony, the ALJ failed to subpoena the doctor at the Plaintiff's request, and the doctor testified by phone.[4]

Relatedly, Thompson next argues that the ALJ improperly attacked the supportability of Dr. Couri's findings. Further, the ALJ's statement that Dr. Couri did not review all the records in evidence had a chilling effect on the proceeding and revealed that the ALJ was not impartial. (Doc. 14, p. 24). Thompson argues that the ALJ made an improper lay medical judgment that Dr. Couri's opinion did not have any significant probative value. (Doc. 14, p. 27). Additionally, he argues the ALJ improperly determined the RFC before discussing Dr. Couri's medical opinions.

---

[4] The Plaintiff also makes an argument about skilled and unskilled work, but does not articulate an argument about the distinction or cite any authority; therefore, the Court is unable to address it.

However, before he delves into any explanation of why this might be improper, or cites to any relevant authority, the Plaintiff states: "Let us look more closely" and follows up with a list of Dr. Winkler's testimony that favors the Plaintiff. (Doc. 14, p. 24-25). Finally, according to the Plaintiff, Dr. Couri wrote many letters that explain Thompson cannot work. (Doc. 14, p. 30).

The Commissioner responds that the ALJ afforded the proper weight to Dr. Winkler and Dr. Couri. Also, the Commissioner argues that Dr. Couri relied upon the Plaintiff's subjective complaints. The Commissioner adds that Dr. Winkler's testimony is more consistent with the record as a whole and does not conflict with the RFC finding.

When assigning weight (or little or no weight for that matter) to medical opinions, the ALJ must "minimally articulate" her reasons for doing so. See *Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008); *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008). An ALJ may afford controlling weight to the medical opinion of a treating physician if the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008), citing *Hofslien v. Barnhart*, 439 F.3d 375, 376 (7th Cir. 2006); 20 C.F.R. § 404.1527(c)(2).

An ALJ must provide "good reasons" for discounting such opinions. *Cambell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010). Should an ALJ provide such "good reasons" for discounting a treating physician's opinion, she must then decide what weight to give that opinion. *Id.* at 308. If the ALJ does not give a treating physician's opinion controlling weight, the Social Security regulations require the ALJ to consider: 1) the length, nature, and extent of the treatment relationship; 2) the frequency of examination; 3) the physician's specialty; 4) the types of tests performed; 5) and the consistency and supportability of the physician's opinion. 20 CFR §

404.1527; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009). The ALJ is required to weigh conflicting evidence from medical experts. See *Books v. Chater,* 91 F.3d 972, 979 (7th Cir. 1996) (pointing out that when assessing conflicting medical evidence, an ALJ must decide, based on several considerations, which doctor to believe). The Court may not re-weigh the evidence. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

Moreover, "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003), citing *Moore v. Barnhart,* 278 F.3d 920, 924 (9th Cir. 2002). See also, *Thomas v. Astrue*, 769 F. Supp. 2d 1113, 1125 (N.D. Ill. 2011). Pursuant to 20 C.F.R. § 404.1527, an ALJ may consider testimony from a nonexamining source.

The ALJ reasonably analyzed the medical opinion evidence and supported his determinations with substantial evidence from the record. First, the ALJ relied upon Dr. Winkler's opinion in his determination that the Plaintiff does not have the signs and symptoms of a disabling spinal column disorder under the listing of impairments. (AR 605). The ALJ also agreed with Dr. Winkler's testimony that the Claimant has mild upper extremity peripheral neuropathy but does not meet the requirements of the Listing for peripheral neuropathy. The ALJ particularly agreed with Dr. Winkler's opinions that the exams did not show persistent and significant disruption of motor functioning, and surgery was not recommended, although surgery would have been suggested for true symptoms of radiculopathy and nerve root impingement. (AR 604-05). The ALJ added that Dr. Winkler assessed Thompson "to be limited to frequent but not constant use of the upper extremities." (AR 605, 761).

The ALJ gave "good reasons" for discounting the opinion of Dr. Couri, and more than minimally articulated his reasons for doing so. *Cambell v. Astrue,* 627 F.3d 299, 306 (7th Cir. 2010); *Elder v. Astrue*, 529 F.3d 408, 414 (7th Cir. 2008); and *Berger v. Astrue,* 516 F.3d 539, 545 (7th Cir. 2008). After evaluating the Claimant's treatment history with Dr. Couri, the ALJ explained that the other evidence on record, including other treating physicians and Dr. Winkler, contradicted Dr. Couri's opinions. (AR 609).

The ALJ cited Dr. Liu's opinion that Thompson's "clinical presentation is not typical for people who have severe chronic pain" (AR 604). The Court's previous order warned that this statement was taken out of context. (AR 833). Specifically, the Court noted that the statement was preceded by the recommendation that Thompson get a second opinion from Mayo Clinic or another medical center. *Id.* However, this is not reversible error, because the ALJ references other medical records including ones from Dr. Smucker, Dr. Couri, Dr. Liu, and Dr. Gowda, before concluding that after 2006 Thompson did not show the disabling signs and symptoms of radiculopathy associated with degenerative disc disease. (AR 605). The ALJ mentions that Thompson has received the following types of treatment: injections, narcotic pain medication, Lidoderm patch, and other medications. *Id.*

Also, Thompson objects to the ALJ giving her lay opinion by soliciting Dr. Winkler to disagree. Indeed, ALJs are not meant to "play doctor" by making their own independent medical findings rather than relying on expert opinion. S*ee Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003). However, that is not the case here; the ALJ did not make his own independent finding. The ALJ sought Dr. Winkler's assistance in filling in the gaps in the record. (AR 1998). An ALJ has a duty to fill gaps in the record and seek additional information for an opinion for which the medical support is not readily

discernible. See *Smith v. Apfel,* 231 F.3d 433, 437–38 (7th Cir. 2000) (the ALJ's duty to develop the record included soliciting updated medical records when the ALJ did not afford the treating doctor's opinion controlling weight on that basis). Thompson also mislabels the ALJ's weight determination of Dr. Couri as an improper lay opinion. The ALJ *must* weigh the medical evidence, and may discount the treating physician's opinion.

A treating physician is entitled to controlling weight if supported by substantial evidence in the record. *Thomas*, 769 F. Supp. 2d at 1124. See also *Meuser v. Colvin*, 838 F.3d 905, 912 (7th Cir. 2016) (where the ALJ erred by rejecting the treating physician and adopting the opinion of the non-examining consultant when he was instead "required to explicitly consider the details of the treatment relationship and explain the weight he was giving the opinion"). The ALJ did not afford Dr. Couri's opinions controlling weight or significant probative value. (AR 609). The ALJ determined that Dr. Couri overstated evidence and relied on the Claimant's subjective complaints. The ALJ reasoned that other substantial evidence in the record did not show neurological compromise or symptoms of radiculopathy. (AR1605, 1686, 1716). Nevertheless, due to his peripheral neuropathy and fibromyalgia, the ALJ limited Thompsons's RFC to "occasional overhead reaching, and he is able to perform other manipulative activities frequently." (AR 610.) The Court does not "undertake a *de novo* review of the medical evidence that was presented to the ALJ. Instead, we merely examine whether the ALJ's determination was reasoned and supported." *Elder v. Astrue,* 529 F.3d 408, 413 (7th Cir. 2008). Indeed, the ALJ's determination here was reasoned and supported; therefore, the Court finds that the ALJ did not err in the weight he afforded the medical opinions.

**5. Limits due to Medication**

In addition to raising an objection to the ALJ's discussion of Thompson's severe/chronic pain, Thompson argues that the ALJ failed to follow the Court's instructions on remand concerning his use of medication. (AR 831-35). According to the Claimant, even Dr. Winkler opined that his medication causes difficulties in focusing, and concentration. (Doc. 14, p. 25, AR 751). Thompson argues that the ALJ did not include the difficulties in concentration and focusing in the hypothetical to the VE or even support this conclusion with medical evidence. (Doc. 14, p. 26).

The ALJ stated that despite the side effects of his medication, Thompson could perform simple and repetitive tasks that involve little or no change in the work routine and is limited in occasional interaction with the public. (AR 607). The ALJ stated that "[Thompson] does not have disabling side effects due to medication" (AR 608). The ALJ noted the side effects of the medication in his RFC determination. (AR 610). The Claimant is prescribed multiple narcotic pain medications. The ALJ acknowledged this, and although the ALJ determined that Thompson did not have disabling signs and symptoms of radiculopathy associated with degenerative disc disease, the ALJ noted that he had been provided with relief from pain medication and the epidural injections. (AR 605). Dr. Winkler's testified that a mental health expert could evaluate Thompson's side effects more accurately, but also agreed that Thompson's medications would cause some difficulties in focusing and concentration. (AR 752). As previously discussed, ALJ adopted the assessment of Dr. Winkler, so the ALJ took this testimony into account when configuring the RFC and effects of medication.

Although Thompson argues that the ALJ's limitation that Thompson could perform simple and repetitive tasks does not adequately address his needs, the Court is not permitted to

supplant the ALJ's findings with the Court's own assessment of the evidence. See *Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). The ALJ found that the medical evidence did not demonstrate that Thompsons' symptoms prevented him from performing such tasks, and the ALJ cited his activities of daily living in support of this determination. Therefore, the ALJ addressed the Claimant's limitations due to his medication, and supported his findings with evidence from the record and testimony from Dr. Winkler. The ALJ complied with the Court's instructions on remand and there is no reversible error.

### 6. Hypothetical to the VE

Thompson argues that the hypothetical posed to the VE at the hearing was improper. He argues that the hypothetical differed from what the ALJ stated in the Decision, and "is much more limiting than the jobs found by the VE thus making the VE's finding inconsistent with the ALJ's decision." (Doc. 14, p. 28). Thompson then launches into an argument that there is conclusive evidence in the record that he cannot perform sedentary work.

The Commissioner responds that SSR 83-12 allows a vocational specialist to decide whether jobs exist for a claimant with Thompsons's limitations, especially sedentary work with a sit/stand option. (Doc. 20, p. 11). Although Thompson argues that the Dictionary of Occupation Titles (DOT) revels that the jobs proposed by the VE require more than frequent handling, the Commissioner argues that these job entries specify that only frequent handling is necessary. The Commissioner also argues that the ALJ did not commit reversible error by failing to resolve conflicts, if any, between the VE's testimony and the DOT entries, because the conflicts were not obvious.

Upon review of the DOT descriptions cited by the ALJ (AR 611)—737.687-126, 735.687-034, and 559.687-014—the Court determines that these jobs require frequent handling.

Thus, the ALJ met his burden of showing there are a substantial number of jobs that the claimant can perform. 20 C.F.R. § 416.912(b)(3). See also, *Liskowitz v. Astrue*, 559 F.3d 736, 742–43 (7th Cir. 2009) ("The Commissioner bears the burden of showing that there are a significant number of jobs that the claimant is capable of performing.").

Further, the ALJ did not pose an improper hypothetical to the VE. "[T]he ALJ must question the vocational expert regarding every impairment set forth in the claimant's record to the extent that the impairment is supported by the medical evidence." *Jens v. Barnhart,* 347 F.3d 209, 213 (7th Cir. 2003), citing *Herron v. Shalala,* 19 F.3d 329, 333 (7th Cir. 1994). The ALJ, however, is "required only to incorporate into [her] hypotheticals those impairments and limitations that [s]he accept[ed] as credible." *Similia v. Astrue,* 573 F.3d 503, 521 (7th Cir. 2009). Indeed, "[a]ll that is required is that the hypothetical question be supported by the medical evidence in the record" and that it "build[s] an accurate and logical bridge between the evidence and his conclusion." *Meredith v. Bowen,* 833 F.2d 650, 654 (7th Cir.1987); *Cass v. Shalala,* 8 F.3d 552, 555–56 (7th Cir.1993); *Zurawski v. Halter,* 245 F.3d 881, 887 (7th Cir. 2001). The hypotheticals posed to the VE reflected those limitations the ALJ found credible and supported by the medical evidence on record.

Thompson's issue with the ALJ's hypothetical seems to be that the VE's findings are inconsistent with the ALJ's decision. The Court interprets this to mean that the jobs proposed by the VE did not include all of his limitations. (Doc. 14, p. 28). The hypothetical posed to the VE was the following:

> Assume the past work activity, same as the claimant's exertional capacity, and limit it at sedentary work, with a need also to have the option to alternate sitting and standing periodically during the day, not necessarily at will, but as circumstances would allow, so that if one desired, one could sit and stand equally throughout the day. No climbing of ladders, ropes, or scaffolds. Other postural functions performed occasionally. Need to avoid environmental hazards. Need to avoid concentrated

exposure, let's say to all environmental factors except noise, occasional overhead reaching. Other manipulative functions can be performed frequently. Limitation to the performance of simple and repetitive tasks that would involve little or no change in work routine, and occasional interaction with the public, coworkers, and supervisors.

(AR 673-74). The ALJ's Decision recites these limitations almost verbatim. In the Decision, the ALJ found that he was limited to sedentary work, with the option to alternate sitting and standing periodically during the day, no climbing, avoiding environmental hazards, avoiding concentrated exposure, occasional overhead reaching, limited to frequent handling, fingering, feeling, and reaching in other directions, limited to performance of simple and repetitive tasks that involve little or no change in work routine, and finally, occasional interaction with the public, coworkers, and supervisors. (AR 607). The RFC is not more limited than the hypothetical. Moreover, the ALJ may accept a vocational expert's testimony, and the ALJ determined here that the VE's testimony was consistent with the DOT, pursuant to SSR 00-4p[5]. (AR 611).

Therefore, the ALJ's hypothetical was not improper, as it was logically supported by medical evidence on the record. Nor is there an inconsistency between the hypothetical posed at the hearing and the ALJ's Decision. Nor did Thompson show how his limitations would disqualify him from these jobs. Moreover, the Court cannot find that the ALJ's credibility determinations, weight afforded to medical evidence, or hypothetical was patently wrong, and therefore these determinations are entitled to deference. *Diaz v. Chater,* 55 F.3d 300, 308 (7th Cir 1995). Accordingly, the Decision of the ALJ must be upheld.

---

[5] Under the regulations and in the Seventh Circuit, an ALJ must inquire into any conflict between the VE's testimony and the DOT. However, here there was no such conflict. SSR 00-4p; *Overman v. Astrue*, 546 F.3d 456 (7th Cir. 2008).

## CONCLUSION

Thompson essentially asks the Court to decide the facts anew, reweigh the evidence, make credibility determinations, and substitute its own judgment for that of the Commissioner, all of which the Court cannot do. See *Powers v. Apfel*, 207 F.3d 431, 434 (7th Cir. 2000), citing *Richardson v. Perales,* 402 U.S. 389, 399–400 (1971) (providing that the Commissioner of Social Security is responsible for weighing the evidence, resolving conflicts, and making independent findings of fact). See also, *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) ("To determine if substantial evidence exists, the court reviews the record as a whole but is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility") (internal quotations omitted).

Accordingly, the Plaintiff's Motion for Summary Judgment is DENIED (Doc. 13) and the Commissioner's Motion for Summary Affirmance is GRANTED (Doc. 19).

Signed on this __24__ day of _____May_____, 2017.

 s/ James E. Shadid_____
James E. Shadid
Chief United States District Judge